DELAWARE INS. CO. (SNELL v.). See Case No. 13,137.

DELAWARE INS. CO. (SPERRY v.). See Case No. 13,236.

DELAWARE INS. CO. (TALCOTT v.). See Case No. 13,734.

DELAWARE INS. CO. (UNITED STATES v.). See Case No. 14,942.

DELAWARE. L. & W. R. CO. (MILLER v.). See Case No. 9,566.

DELAWARE, L. & W. R. CO. (WARREN v.). See Case No. 17,194.

---

## Case No. 3,766.

DELAWARE MUT. SAFETY INS. CO. v. GOSSLER et al.

[Holmes, 475.] [1]

Circuit Court, D. Massachusetts. March Term, 1875. [2]

BOTTOMRY AND RESPONDENTIA BOND—CONDITIONS — "UTTER LOSS" — STRANDING AND ABANDONMENT TO INSURERS—RIGHT TO PROCEEDS.

1. A bottomry and respondentia bond conditioned to be void in case of "utter loss" of the

---

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission.]

[2] [Affirmed in 96 U. S. 645.]

vessel during a certain voyage, is not discharged by the stranding of the vessel during the voyage, and abandonment to insurers as a total loss, and sale by them at the place of stranding as not worth repairing, if the vessel exists in specie at the time of the sale.

[See note at end of case.]

2. The holder of such a bond, in case of shipwreck of the vesel not amounting to an utter loss within the meaning of the bond, is entitled to the proceeds of the cargo saved, as against insurers of the cargo who have accepted abandonment and paid the owners as for a total loss.

[See note at end of case.]

Action at law. The plaintiff corporation was insurer of a cargo of sugar on board the North German bark Francis, from Java to Boston. The vessel sailed from Pasoeroean, Java, with said cargo on board. Soon after leaving her port of departure she encountered a hurricane, and was compelled to cut away her masts to save vessel and cargo. At the neighboring port of Surabaya, Java, she was partially repaired, and thence necessarily proceeded to Singapore, Straits Settlements, in tow of a steamer, where her repairs were completed and she was fitted to continue the voyage. To meet the expenses of repairs upon the bark, the master was compelled to borrow at Singapore the sum of $26,055.43, Singapore currency, and executed, July 12, 1872, a bottomry bond for that sum, with marine interest at 27½ per cent. upon the vessel, cargo, and freight. The bark sailed from Singapore for Boston, encountered a storm in the month of December following, and was cast ashore on Cape Cod, Massachusetts. The defendants, who were agents of the bondholders and assignees of the bond, took measures to save as much as possible from the wreck, and succeeded in saving somewhat less than half the sugar on board, which was forwarded to Boston and sold. The vessel was surveyed as she lay upon the beach, found incapable of repair, and her sails, rigging, &c., and afterwards the hull, were sold by auction for the underwriter. When the vessel was sold, she lay "on the beach, full of water, as high as she could, but so low as to be submerged at high water." The hull was sold for $2,000, and was resold by the purchaser, on the same day, for about $6,000. Upon learning of the disaster to the vessel, the owners of the cargo made abandonment in writing to the plaintiff as underwriter thereon, and claimed payment for a total loss under their policies. The abandonment was before the sales. After the sales the plaintiff corporation paid to each of said owners the amount of a total loss under said policies, and, on the same date, received from each of the owners an assignment and transfer in writing of "the sugar of said owners, and all their right, title, interest, trust, claim, and demand therein and thereto." The defendants, as agents of the bondholders, with the consent of the owners of the cargo, sold the sugar saved, and held the proceeds, claiming them on account of said bond; the net proceeds of the saved

cargo not being sufficient to satisfy the bond. The plaintiff corporation claimed the proceeds of the cargo saved, as underwriter who had accepted abandonment, and paid a total loss thereon; and this action was brought to recover those proceeds.

Sidney Bartlett and Curtis & Reed, for plaintiff.

Sohier & Welch, for defendants.

SHEPLEY, Circuit Judge. This contract of bottomry and respondentia contains the following condition, upon the construction of which, as affecting the rights of the parties at common law, upon the well-settled principles of law applicable to similar contracts, depends the ownership of the fund in controversy: "Provided, nevertheless, and it is hereby agreed, that if, in the course of the said voyage, an utter loss of the said vessel by fire, lightning, enemies, men-of-war, or any other perils, dangers, accidents, or casualties of the seas or navigation, shall unavoidably happen, then the said loan and interest shall not be payable, and all parties liable therefor shall be wholly discharged therefrom, and the loss shall be wholly borne by the said lenders or bondholders, and every thing herein contained for payment thereof shall be void and determined; save and except only, and provided in such case, that the said lenders or bondholders shall be entitled to such average as can be hereby lawfully secured to them on all salvage recoverable in respect to the said vessel, freight, and goods, or any of them." The meaning of the clause of exception at the close of this condition is not obvious at the first glance. It is claimed that the effect of it is to give to the bondholder, to the extent of the sum due to him, all the property saved in case of wreck. If that was the purpose of the clause, it could have been simply expressed in language free from ambiguity. But the language does not entitle the bondholders to the effects saved. It does not entitle them to salvage, but "to such average as can be lawfully secured to them (the bondholders) on all salvage recoverable," &c. Perhaps some light may be thrown upon the history of the use of such a phrase as "average upon salvage," in connection with the right of the lender upon general adventure to a claim upon any of the effects saved, by reading the discussion between Valin and Emerigon, to be found in the commentary of Valin upon the Ordonnance de la Marine, liv. 3, tit. 5, art. 18, "Des Contrats à Grosse Aventure." The article itself provides, "S'il y a contrat à la grosse & assurance sur un même chargement, le donneur sera préféré aux assureurs sur les effets sauvés du naufrage pour son capital seulement." If there be a contract of maritime loan and an insurance upon the same cargo, the lender shall be preferred to the insurers upon the effects preserved from shipwreck for his capital, and

no further. In commenting upon this article, Valin zealously contends against what he considers the gross injustice of such a preference of the lender upon bottomry or respondentia upon the goods saved, over the insurer, and he supposes the case of a cargo worth twenty thousand livres, on which the bondholder had a claim for ten thousand, and there was insurance to the amount of ten thousand on the surplus, insisting that in such a case the insurer should share proportionably with the bondholder in the effects saved. He refers the question to Emerigon, who does not concur in the views of Valin, and gives conclusive reasons against the construction contended for by Valin, adding that he has consulted the tribunal of the admiralty at Marseilles, where the opinions were unanimous that this privilege was conceded to the bondholder by the eighteenth article in favor of commerce. Boulay-Paty also agrees with Emerigon. The views of Valin never seem to have been recognized in the commercial code of any nation. It is worthy of note, however, that he contended that the lender upon bottomry or respondentia should share with the insurer or the owner in the effects saved, in proportion to their respective interests in the property at risk. This would have been an "average of the salvage." The insertion of this clause might have resulted from an attempt to establish, by agreement of the parties, a rule of division of the effects saved between the bottomry lender and the insurer, in proportion to their respective interests, in lieu of the well-established rule of the maritime law, which prefers the bondholder to the extent of his original loan.

Sir Robert Phillimore, in the case of **The Great Pacific**, L. R. 2 Adm. & Ecc. 385 (after adverting to the fact that a stipulation couched in these very words was of common occurrence, and found in the old forms of bonds in the early editions of Abbott on Shipping, and in the edition of 1781 of Westkitt's Digest of the Laws of Insurance), speaks of it as derived, probably, from the mercantile usages of Spain, with respect to vessels trading with the Spanish West Indies, and that it referred to cases in which the ship had been so wrecked that portions of her alone remained, such as planks, spars, rigging, and the like, when, to use the expression of Emerigon, "Les débris du navire naufragé existent, mais le navire n'existe plus." The case of The Great Pacific was heard on appeal from the high court of admiralty to the privy council. Stephens v. Broomfield, L. R. 2 P. C. 516. Sir James W. Colville, in pronouncing the judgment in the case, says, with reference to this clause: "Whatever it means, their lordships believe that it was intended to secure the payment to the bondholders of something which the obligors might become entitled to receive from third parties in respect of the ship, and not a division of the proceeds of the sale of the vessel between the bondholders and the ship-

owners. It would meet the case suggested at the bar, in which, the vessel having been voluntarily stranded, with a view to the preservation of the cargo, general average upon the cargo salved might become due from the owners of that cargo to the owners of the ship. That such average would become due, if the ship, failing to get off, is totally lost, seems to be a question upon which jurists are not agreed. See Abb. Shipp. (10th Ed.) pp. 373, 375, and 2 Phil. Ins. § 1315. But the clause may, nevertheless, have been designed to cover such average, if the right to it existed." The judgment in that case was that, whatever might be the construction of the clause, it could have no operation in the case of The Great Pacific, unless there had been a loss of the vessel wthin the meaning of the clause; and there had been no such loss in that case, because the ship remained in specie, though so much damaged as not to be worth repairing.

It may be well to note that the words in the condition in the case of The Great Pacific were, "in case of loss," and in this case, "in case of utter loss;" and to remark, that the sum for which the hull of the ship sold after the disaster bore about the same proportion to the original value as in the case at bar. Whatever be the true construction of this exception, it is manifest that the exception can have no application to the facts in this case. The exception applies only in case of "an utter loss," and not of a constructive total loss, of the vessel. The words are, "save and except only and provided in such case that the said lenders or bondholders shall be entitled to such average as can hereby be lawfully secured to them on all salvage recoverable in respect to the said vessel, freight, and goods, or any of them." The words "in such case" refer to the contingency, and the only contingency, provided for in the preceding paragraph of the exception, "if, in the course of the said voyage, an utter loss of the said vessel, by fire, lightning, enemies, men-of-war, or any other perils, dangers, accidents, or casualties of the seas or navigation, shall unavoidably happen." The exception is, therefore, applicable only in case of "an utter loss" of the said vessel. In this case, the vessel did not arrive at her port of destination; she was sold at an intermediate place, on the beach, near Truro, Cape Cod, by the voluntary act of the underwriter (who, after the abandonment, was the owner), in the exercise of a wise discretion, because the expense of the necessary repairs would have exceeded the value of the vessel when repaired, and because there was not a reasonable expectation of getting her off the beach where she was stranded, without an expenditure which would not have been justified by the existing state of facts. There was clearly a constructive total loss of the ship, which would have entitled her owners to recover from the underwriter the whole amount of her insurance; but there was not that actual or absolute total loss, or, in the words of the condition of this bond, that "utter loss," which would discharge from his liability the borrower of money upon bottomry, inasmuch as the ship existed in specie at the time of her sale.

"There is not, in respect to the contract" (of bottomry), "any constructive total loss. Nothing but an utter annihilation of the subject hypothecated will discharge the borrower on bottomry." "The property saved, whatever it may be in amount, continues subject to the hypothecation." 3 Kent, Comm. § 359. Lord Ellenborough, in Thomson v. Royal Exchange Assur. Co., 1 Maule & S. 30, says: "In the case of bottomry, nothing short of a total destruction of the ship will constitute an utter loss; if it exists in specie in the hands of the owner, it will prevent an utter loss." In The Catherine, 1 Eng. Law & Eq. 679, 15 Jur. 231. Dr. Lushington, referring to the case last cited, says: "In that case, Lord Ellenborough decided that the bond could not be lost so long as the vessel remained in specie. That was the law of this country long before Lord Ellenborough so declared it. If a ship was once bottomried, the bond attached to the very last plank, and the holder might have that sold for his benefit." See, also, The Dante, 2 W. Rob. Adm. 427; The Draco [Case No. 4,057]; The Elephanta, 9 Eng. Law & Eq. 553. In Broomfield v. Southern Ins. Co., L. R. 5 Exch. 192, Martin, B., says: "Now, it has been held that, in construing a bottomry bond, 'loss' means a loss by going to the bottom of the sea." This was an action upon a policy of insurance upon the bottomry bond given on the Great Pacific, and the court of exchequer followed the decision of the privy counsel in Stephens v. Broomfield, L. R. 2 P. C. 516. "'Utterly lost,'" says Tilghman, C. J., "is a strong expression, intended, as I conceive, to be distinguished from 'technically lost.' A ship is not utterly lost while she remains in specie in the hands of the owners. Had she been taken by an enemy, she would have been utterly lost to the owner. So, had she been burned or wrecked and gone to pieces. But she is not utterly lost merely because it may cost more than she is worth to repair her." Insurance Co. of Pennsylvania v. Duval, 8 Serg. & R. 138. This was the case of a respondentia bond of a form peculiar to Philadelphia, which, in case of utter loss of the vessel, entitled the lenders to a just and proportional average on cargo not avoidably lost, and made the lenders liable to average and entitled to salvage in the same manner as if they were underwriters. It is clear, therefore, that no utter loss of the vessel has happened which would render the contract void. The rights of the parties are dependent upon the state of facts at the time of the sale of the ship, when she existed in specie, and are not affected by the subsequent total destruction of the vessel. This was so settled

by Mr. Justice Story, in the case of The Draco [supra]. The clause of exception, which only applies in case of an utter loss, has no application to the case at bar. The rights of the bondholders are the ordinary rights of a lender upon maritime contracts of this description, in case of shipwreck, to the salved effects to the extent of his loan. The definition by Bynkershoek of the contract shows what these rights are. He defines such contracts to be a pledge of the vessel, or other effects upon which the loan is made, and of what may remain of them after any event by which the personal responsibility of the borrowers is excused. Bynk. Quaest. Pub. lib. 3, c. 16. By the French ordinance (title 5, art. 17), it was provided that, in case of shipwreck, the contracts of maritime loan shall be reduced to the value of the effects that are saved: "Seront toutefois, en cas de naufrage, les contrats à la grosse, réduits à la valeur des effets sauvés." Emerigon says: "From the moment of the accident, the lender is seised of right of the effects saved. He has a special lien upon them for the payment of his debt, saving the freight and salvage."

By the general marine law, the lender on bottomry is entitled to be paid out of the effects saved, as far as those effects go, if the voyage be disastrous. 3 Kent, Comm. (12th Ed.) 359, 360. "The property saved, whatever may be the amount, continues subject to the hypothecation." The borrowers, in case of shipwreck, are not personally bound, except to the extent of the salved effects, or their proceeds, which come into their hands. The Virgin, 8 Pet. [33 U. S.] 538.

The bond in this case is upon both ship and cargo, a bottomry and respondentia bond united. The maritime risk, however, upon which the bond is conditioned, is that of the utter loss of the ship. It was suggested at the argument, that the two subjects of the hypothecation might be divided, and each governed by its own law-merchant. I think this contradicts that clause in the bond which provides that, in case of an utter loss of the vessel, the bond shall not be payable. If at the time in reference to which the rights respectively of the lender and the borrower are to be determined, namely, the time when the sale took place, there had been an utter loss of the vessel, by either of the risks enumerated, I am of opinion that the bond would have been void, and the bondholders would have lost all claim, under this form of bond, to the cargo saved. A case, in many respects like this, is put and answered in the second title of the twenty-second book of the Digests, entitled, "De Nautico Foenore," 6 Paulus, lib. 25 Quaestionum. "When maritime money is thus given, the lender has no right to demand his money unless the vessel arrives in safety, at the stipulated time. The obligation of the debt is extinguished by the nonexistence of the condition; and therefore the lien on the pledge is also gone, even on those that are not lost." In this case, the vessel did not arrive in safety, but the voyage being terminated by a sale at an intermediate place, while the vessel existed in specie, and was only constructively totally lost as affecting a contract of insurance, but not utterly lost within the meaning of the condition in a bottomry bond, the property salved continues subject to the hypothecation. Judgment for defendants.

[NOTE. On appeal by plaintiffs the judgment was affirmed by the supreme court. Delaware Mut. Safety Ins. Co. v. Gossler, 96 U. S. 645. In the opinion, delivered by Mr. Justice Clifford, the court says: "Authorities, to show that the doctrine of constructive total loss is in no respect applicable to such a contract, are numerous, unanimous, and decisive. Thomson v. Royal Exchange Assur. Co., 1 Maule & S. 30. In the case of bottomry, said the chief justice in that case, nothing short of a total destruction of the ship will constitute an utter loss; for, if it exist in specie in the hands of the owner, it will prevent an utter loss; and text writers of the highest repute adopt the same rule, and express it in substantially the same language. Nothing but an utter annihilation of the subject hypothecated, says Chancellor Kent, will discharge the borrower on bottomry; the rule being that the property saved, whatever it may be in amount, continues subject to the hypothecation. 3 Kent, Comm. (12th Ed.) 359; Williams & B. Adm. Pr. 47. Unless the ship be actually destroyed, and the loss to the owners absolute, it is not an utter loss within the meaning of such a contract. If the ship still exists, although in such a state of damage as to be constructively totally lost, within the meaning of a policy of insurance; or if she is captured and afterwards retaken and restored, she is not utterly lost, within the meaning of that phrase in the contract of hypothecation. Maude & P. Shipp. (3d Ed.) 44; The Catherine, 1 Eng. Law & Eq. 679; The Elephanta, 9 Eng. Law & Eq. 553. Support to that view, of a decisive character, is derived from the case of Pope v. Nickerson (Case No. 11,274), decided by Judge Story, where he says, that, in cases of bottomry, nothing but an actual total loss of the ship in the voyage will excuse the borrower from payment; not even when by reason of the enumerated perils the ship shall require repairs greater than her value; and he adds that the proposition is fully borne out by authority; and he adopts and fully approves what was decided in the case of Thomson v. Royal Exch. Assur. Co., to which reference has already been made, that the question in such a case is not, whether the circumstances were such as that, in case of insurance, the insured might have abandoned the ship, but whether it was an utter loss within the true intent and meaning of a bottomry contract; and he held that, in cases of bottomry, a loss not strictly total cannot be turned into a technical total loss by abandonment, so as to excuse the borrower from payment, even when the expense of repairing the ship exceeds her value. * * * Actual total loss of the property by the described perils displaces the lien of the lender, and defeats his right of recovery; but the rule is, that, if the ship is once bottomried, the bond attaches to the very last plank, and the holder of the bond may have that sold for his benefit. The Catherine, 1 Eng. Law & Eq. 679. Abundant authority exists for that proposition, and the court is of the opinion that the same rule is applicable to the cargo in cases where it is without condition covered by the bond. The Virgin, 8 Pet. (33 U. S.) 538. Prior remarks are sufficient to show that the doctrine of constructive total loss is not applicable to

contracts of bottomry, which serves very strongly to show that the maritime lien of the bondholder attaches to every part of the property covered by the bond, as seems to follow from all the authorities upon the subject. Broomfield v. Southern Ins. Co., L. R. 5 Exch. 192."]